FILED - WESTERN DIVISION
CLERK, U.S. DISTRICT COURT

JAN - 8 2009

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| WALLACE WENDELL VAUGH III,<br><br>Petitioner,<br><br>v.<br><br>KEN CLARK (Warden),<br><br>Respondent. | No. CV 06-5990-R (AGR)<br><br>ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION |

Pursuant to 28 U.S.C. § 636, the Court has reviewed the entire file de novo, including the Petition, the Magistrate Judge's Report and Recommendation, the Objections to the Report and Recommendation, and all records in the file.  Having made a de novo determination, the Court agrees with the recommendation of the Magistrate Judge.

IT IS ORDERED that Judgment be entered denying the Petition and dismissed this action with prejudice.

DATED:  Jan. 8, 2009

_____
MANUEL L. REAL
UNITED STATES DISTRICT JUDGE

1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9          CENTRAL DISTRICT OF CALIFORNIA
10
11   WALLACE WENDELL VAUGHN III,          )   NO. CV 06-5990 R (AGR)
12                Petitioner,              )
13                   v.                    )
14   KEN CLARK (Warden),                   )   REPORT AND
                                           )   RECOMMENDATION OF UNITED
15                Respondent.              )   STATES MAGISTRATE JUDGE
16                                         )
17   _____)
18          The Court submits this Report and Recommendation to the Honorable
19   Manuel L. Real, United States District Judge, pursuant to 28 U.S.C. § 636 and
20   General Order No. 05-07 of the United States District Court for the Central District
21   of California.  For the reasons set forth below, the Magistrate Judge recommends
22   the Petition for  Writ of Habeas Corpus be denied.
23   ///
24   ///
25   ///
26   ///
27   ///
28   ///

# I.

## SUMMARY OF PROCEEDINGS

On December 24, 2002, Petitioner was convicted of two counts (Counts 1 and 5) of first degree murder with special circumstances (Cal. Penal Code § 187(a), 190.2(a)(3) & (21)), and seven counts (Counts 2, 3, 4, 6, 7, 8 and 13) of attempted murder (Cal. Penal Code §§ 664 & 187(a)).  The jury found true allegations of premeditation and deliberation with respect to five of the seven attempted murder counts (Counts 2, 6, 7, 8 and 13), and found firearm enhancement allegations true as to every conviction.  (Lodged Documents ("LD") 10 at 546-55, 558-64; LD 9 at 2135-47.)

On March 5, 2003, the trial court sentenced Petitioner to state prison for two terms of life without possibility of parole ("LWOP") plus 25 years on Counts 1 and 5.  Petitioner received three terms of life in prison with possibility of parole plus 25 years on Counts 2, 6, and 7; one term of life with possibility of parole plus 20 years on Count 8; one term of life with possibility of parole plus one year on Count 13; one term of nine years ("upper term") plus 25 years to life on Count 3; and one term of 2 years, 4 months plus 25 years to life on Count 4.  (LD 10 at 579-86; LD 9 at 2219-22.)

On October 5, 2004, the California Court of Appeal affirmed the conviction in Case No. B165489.  On December 15, 2004, the Supreme Court granted the petition for review and stayed further action and briefing pending disposition of two cases then under consideration, *People v. Towne* and *People v. Black*.  (Lodged Document ("LD") 7.)  On September 7, 2005, the Supreme Court dismissed further review based on its decision in *People v. Black*, 35 Cal. 4th 1238, 29 Cal. Rptr. 3d 740 (2005).  (LD 8.)

On October 14, 2005, the California Court of Appeal issued an opinion which again denied relief and addressed *People v. Black*.  (Ex. 1 to Answer.)

1    On September 20, 2006, Petitioner, acting *pro se*, filed a Petition for Writ of

2    Habeas Corpus by a Person in State Custody ("Petition") in this Court.  Petitioner

3    raises three grounds: (1) police failed to "scrupulously honor" his invocation of his

4    right to remain silent, resulting in the Petitioner's allegedly tainted statement to

5    the police on July 25, 2001; (2) the subsequent statement Petitioner made to the

6    police on July 26, 2001, was obtained through exploitation of his allegedly tainted

7    statement of July 25, 2001; and (3) upper term and consecutive sentences

8    violated Petitioner's Sixth Amendment right to trial by jury.  (Petition at 5-6.)

9    On December 18, 2006, Respondent filed an answer, admitting timeliness

10    and that the issues presented to this Court are exhausted.  (Answer at 2.)  On

11    January 19, 2007, Petitioner filed a traverse and on October 29, 2007, he filed a

12    supplemental traverse.

## II.

## STATEMENT OF FACTS

15    Below is a summarization of the facts set forth in the California Court of

16    Appeal decision on direct review.  To the extent an evaluation of Petitioner's

17    claims for relief depends on an examination of the record, the Court has made an

18    independent evaluation of the record specific to Petitioner's claims for relief.

19    A.    Motion to Suppress.  Petitioner[1] moved to suppress statements

20    he made to the Long Beach Police Department on July 25 and

21    26, 2001, on the grounds that the statements were taken in

22    violation of his rights under *Miranda v. Arizona*, 384 U.S. 436

23    (1966).

24    (1) Petitioner's Declaration.  In a declaration filed in support

25    of the motion, Petitioner set forth the following facts.  He was

26    arrested on July 25, 2001.  After being left alone in an interview

28    [1]    The Court of Appeal referred to Petitioner as "Appellant."  For
simplicity and to avoid confusion, the term "Petitioner" is used herein.

3

room for 20 to 30 minutes, Detectives Richard Conant and Mark McGuire entered.  Detective Conant told Petitioner he had to fill out papers so they could talk.  Petitioner replied "I have nothing to say" and "I'm not filling out any papers, can I go now."  Detective Conant informed him he had been arrested for murder.  Petitioner told the detectives:  "I didn't kill anybody and I'm not talking to you."  Detective Conant said he was going to get the death penalty.  The detectives left the room.  When they returned, Petitioner "agreed to talk because I was afraid I would get the death penalty if I did not talk and Detective Conant had said I was going to get the death penalty but he could help me if I agreed to talk."  The next morning, Petitioner was told the detectives wanted to talk to him again.  He said he "did not want to talk to anyone anymore."  He claimed to have not been fed or given a mattress to sleep on and denied having been given any sort of form to sign.  He claimed to have agreed to "everything [he] thought they wanted [him] to agree with" because he was "tired, sleepy and hungry and just wanted to get the interview over with."

(2)  Detectives' Testimony at Hearing.  A hearing was held on Petitioner's motion to suppress.  Detective Conant testified that he interviewed Petitioner in connection with the death of Jesus Bicuna on July 25, 2001, at around 1:30 p.m.  Detective McGuire was also present.  They had with them an advisement of rights form, a probable cause declaration form, and a booking form.  They advised Petitioner of his *Miranda* rights.  Petitioner refused to talk to the detectives, and that was written on the rights form.  The detectives left.

4

1     Detective Conant returned after a few minutes to fill out the

2     probable cause form.  Petitioner asked him what he was doing.

3     Detective Conant told him, and read what had been written on

4     the form--that Petitioner was placed under arrest after he was

5     positively identified by a six-pack of photographs as the person

6     who had shot Bicuna and three others.  Petitioner asked what

7     the charges were, and was told he was being charged with

8     murder.  Petitioner asked for details about the shooting, but

9     Detective Conant told Petitioner that he would have to waive his

10     *Miranda* rights to discuss the case.  Detective Conant did tell

11     Petitioner about the range of penalties for murder in response to

12     another question from Petitioner, and got a copy of the Penal

13     Code so that Petitioner could read about the subject himself.

14     Petitioner again asked about his case, and was told he would

15     have to waive his rights to discuss it.  At that point, Petitioner

16     agreed to waive his right to remain silent.

17     The detectives interviewed Petitioner and tape-recorded his

18     statement approximately two hours after the interview began.

19     They did not tell Petitioner what to say or give him details about

20     the crime so he could recite them on the tape.  They did not tell

21     Petitioner he would get the death penalty if he did not talk to

22     them.  On the first tape, Petitioner agreed that he had initially

23     refused to talk, but then "decided that [he] wanted to talk to [the

24     detectives] before [he was] taken down and . . . booked."

25     Detective Michael Edwards testified that he and Detective Hector

26     Nieves interviewed Petitioner on July 26, 2001.  They reminded

27     him he had been read his rights the day before.  He agreed to

28     talk to them.  They started speaking to him at around 10:30 a.m.,

and began taping at around 1:50 p.m.  At some point, Petitioner told the detectives he had been threatened that he would get the death penalty if he confessed to more than one murder.  They talked to him about how the decision is made to seek the death penalty, but did not make him any promises.  The detectives told Petitioner they were aware that a Toyota van was used in the shootings, that there were three shootings, the addresses where the shootings occurred, that there were three people involved, that an assault-type rifle was used, and that some casings had been recovered.  On the second tape, Petitioner stated he remembered being read his rights the day before and remembered agreeing to talk and waive his rights.  Petitioner further stated on the tape that he had been treated fairly, and supplied with drinks and bathroom breaks.

(3) Petitioner's Testimony at Hearing.  Petitioner testified that he was arrested at around 11:00 a.m. and taken to an interview room where he was joined by Detectives Conant and McGuire. He asked what he was there for, and Detective Conant said he had to fill out some papers before they could talk to him. Petitioner told the detectives he did not want to talk to them. Detective Conant started to fill out some papers, and acted like he was angry at Petitioner.  He said "We have you now.  You can't get away from us. . . .  [Y]ou're gonna get the death penalty, you little mother fucker."  Both detectives left the room. Detective Conant returned and started filling out papers. Petitioner asked him what he was filling out.  Detective Conant said he could not tell him unless he agreed to talk to the detectives.  Petitioner asked about the death penalty, and

6

1   Detective Conant gave him a book.  Detective Conant told
2   Petitioner they would help him, and if he cooperated and talked
3   to them, he would not get the death penalty.  Petitioner agreed to
4   talk to them.
5   The next day, Petitioner was told to talk to Detectives Edwards
6   and Nieves or he would be thrown in "the hole."  He did not want
7   to talk to them, but he did not tell them that.  Instead, he told the
8   jailer he did not want to talk to them.  The detectives told him his
9   rights had been waived and that they could talk to him without
10   going through the procedures that he went through the day
11   before.  Petitioner claimed not to understand that he could have
12   an appointed attorney with him during questioning by police or
13   that things he said to police could be used in court against him.
14       (4) Court's Ruling.  The court denied the motion to suppress.
15   The court "did not find [Petitioner] credible when he claimed he
16   did not understand the plain language in the waiver forms."  The
17   court found that the detectives "scrupulously honor[ed]"
18   Petitioner's invocation of his right to remain silent, and that
19   Detective Conant's actions in reentering the interview room to fill
20   out forms was not the equivalent of interrogation or conduct
21   designed to elicit comments from Petitioner.  The court further
22   found that Petitioner had not been threatened with the death
23   penalty in order to induce him to talk or promised consideration if
24   he cooperated.  The court ruled that the form used to give
25   Petitioner his *Miranda* rights was adequate.  The court concluded
26   that there was no requirement that Petitioner be re-*Mirandized*
27   prior to questioning on the 26th.
28

7

B. Evidence at Trial.

(1) Petitioner's Taped Confessions.  The tapes were played to the jury.  On the tape dated July 25, 2001, describing the July 2001 shootings, Petitioner said that he had a 44 caliber gun and was driving with a friend in a Blue Cutlass, and spotted a "Mexican guy with [a] bumble-bee on his neck" on the curb in front of a house.  Petitioner believed he recognized the man as having shot his (Petitioner's) cousin.  Petitioner jumped out of the car and fired two shots.  The man ran, and Petitioner chased and shot at him.  Petitioner claimed to have been trying to paralyze the victim rather than kill him and to not wanting anybody innocent to be wounded.  As Petitioner and his companion drove away, they saw the police behind them.  Petitioner jumped out. As he ran, the gun in his waistband slid out onto the ground. On the tape dated July 26, 2001, Petitioner was interviewed concerning the May 2000 shootings.  Petitioner testified he had been drinking and smoking PCP with some acquaintances. They got into a van and told Petitioner they were "fixin' to . . . hunt . . . this 'bald head' down," by which they meant someone of Mexican descent.  When the group spotted the victim riding in a car, Petitioner recognized him as someone who had pulled a gun on Petitioner in the past.  Petitioner grabbed a gun belonging to someone else in the van and opened fire out the window.  He fired both at the car and at people standing nearby.  The van door was opened momentarily and some casings fell out.  The driver of the van took them to another location where there was a party going on.  The people at the party were older Hispanics. Another member of the group shot at the house.  Someone shot

back. They drove off, and a few moments later, shot a Hispanic man parking a dark colored Honda on Eighth Street. Petitioner did not fire the shot, but encouraged his companion to "hurry up" and do it. Petitioner identified the van from a photograph of a grayish Toyota van with a brown stripe down the side shown to him by the detectives. He was also shown photographs of some of the victims and identified them as people who had been at the party or who had yelled at or shot at the van and its occupants.

(2) First May 2000 Shooting (Counts Six Through Eight).

Henry Cifuentes, a former Eastside Longos gang member, testified that he was shot in May 2000 while riding in a car with his girlfriend and two friends, Fernando Rubio and Fidel Rosales. Fidel Rosales testified to being shot, and hearing a total of between six and eight gunshots. Neither saw the assailant. Eva Cornejo, a nearby resident, saw a van drive past her window and observed gunshots coming from it.

Copitzy Rodriquez, Cifuentes' girlfriend, testified that she was driving at the time of the incident. She heard shots. She saw a white van. She saw the other occupants of the car lying on the ground after the shooter or shooters left.

A detective for the Long Beach Police Department searched the area and found an "S and B 762 caliber shell casing."

Kham Vin testified that his van was stolen in May 2000. He did not own a gun and had never fired a gun from his van. Bullet casings, bullet fragments and fingerprints were found inside his van when it was impounded by the police. A ballistics expert testified that the shells were designed to be fired from an assault-type rifle, and were fired by the same gun as the shell

9

found on the ground near the first May 2000 shooting and shells found in the area of the second May 2000 shooting (discussed below).

(3)  Second May 2000 Shooting (Counts Nine Through Twelve).  Enrique Anaya testified to being shot while standing in front of his house in May 2000.  Criscencio Jaramillo, Rigoberto Bernal, and Manuel Contreras were with him.  He heard from six to eight shots, but did not see where they were coming from.  Jaramillo testified that he was also shot that day.  He did not see the assailant.

Detective Victor Feria was called to the scene and observed wounds on Anaya, Jaramillo, Contreras, and Bernal.  He picked up eight 762 caliber casings at the scene.

(4)  Third May 2000 Shooting (Count Thirteen).  Vicente Molina was shot in May 2000, while parking a car.  A small van pulled up alongside him containing a single Black man.  A gun was sticking out the window.  One shot was fired.  The bullet passed through his head, but he survived.

(5)  July 2001 Shooting (Counts One Through Four).  Juan Espinoza testified that he was shot in front of the apartment house where his nephew's baptism party was being held.  He was standing with his uncle, Juan Carlos Espinoza, and "Francisco Javier."FN4.  Juan Espinoza heard someone yell "[l]ook out, careful" and saw a Black man pointing a gun.  He identified Petitioner as the man he saw.  He had previously identified Petitioner out of a photographic six-pack and at a prior hearing.  After being shot once, Juan Espinoza ran and Petitioner chased him and shot him again.

10

FN4.  The full name of Francisco Espinoza, the victim named in count three, is "Francisco Javier Espinoza."

Francisco Espinoza testified that he was struck three times while standing in front of the apartment house with "Juan" and "Jesus." He heard about five shots.  Just before the shooting, he saw a dark car containing two Black men pull up.  One of the men got out and began shooting.  The witness identified Petitioner as the shooter.

Fidela Acevedo was leaving the party with her father, Jesus Bicuna, and her mother when the shooting started.  She did not see the man who was doing the shooting.  She was struck with a bullet.  Her father was shot and killed.

Guillermo Cruz, who lived near the house where the party was taking place, heard gunshots and saw a Buick with a dark vinyl top stopped in the middle of the street.  He observed an occupant of the vehicle get out and shoot a young man in the face.  He could not identify the shooter other than as a dark man.

Long Beach Police Officer Robert Bernsen received a call describing a light blue Buick Regal leaving the scene of a shooting.  He and his partner saw a vehicle matching that description.  There were two Black male occupants.  The officer called for back up, and when it arrived, signaled the vehicle to stop by activating the patrol car's siren and lights.  The Buick stopped, the passenger jumped out, and then the Buick started to pull away.  Officer Bernsen and his partner followed the vehicle, and ultimately arrested the driver.  The driver was identified as Santawn Miller.  Fingerprints lifted from the Buick matched Petitioner's.

11

1    Sergeant Joel Cook heard the description of the Buick Regal and

2    the report that a vehicle matching that description had been

3    spotted.  He drove to the area where the car was stopped.  He

4    saw a Black male run past his car.  The sergeant repeatedly

5    ordered him to stop, but the man did not comply.  The sergeant

6    retraced the suspect's route and discovered a semi-automatic

7    pistol on the sidewalk.  He was later shown a photographic six-

8    pack and identified Petitioner as the man he had seen that night.

9    Officer Ronald Burgess was called to the scene and discovered

10   three .44 Magnum shell casings and a copper-jacketed slug.  A

11   police criminalist later determined that the shell casings collected

12   from the scene of the shooting were fired from the gun found by

13   Sergeant Cook.

14  (Answer Ex. 1 at 3-11.)

15                                    III.

16                         **STANDARD OF REVIEW**

17        A federal court may not grant a petition for writ of habeas corpus by a

18  person in state custody with respect to any claim that was adjudicated on the

19  merits in state court unless it (1) "resulted in a decision that was contrary to, or

20  involved an unreasonable application of, clearly established Federal law, as

21  determined by the Supreme Court of the United States"; or (2) "resulted in a

22  decision that was based on an unreasonable determination of the facts in light of

23  the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d);

24  *Woodford v. Visciotti*, 537 U.S. 19, 21, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002)

25  (per curiam).

26        "'[C]learly established Federal law' . . . is the governing legal principle or

27  principles set forth by the Supreme Court at the time the state court rendered its

28  decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 155 L. Ed.

                                    12

2d 144 (2003). A state court's decision is "contrary to" clearly established Federal law if (1) it applies a rule that contradicts governing Supreme Court law; or (2) it "confronts a set of facts . . . materially indistinguishable" from a decision of the Supreme Court but reaches a different result. *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002). A state court's decision cannot be contrary to clearly established Federal law if there is a "lack of holdings from" the Supreme Court on a particular issue. *Carey v. Musladin*, 549 U.S. 70, 74, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006).

Under the "unreasonable application prong" of section 2254(d)(1), a federal court may grant habeas relief "based on the application of a governing legal principle to a set of facts different from those of the case in which the principle was announced." *Lockyer*, 538 U.S. at 76; *see also Woodford*, 537 U.S. at 24-26 (state court decision "involves an unreasonable application" of clearly established federal law if it identifies the correct governing Supreme Court law but unreasonably applies the law to the facts).

A state court's decision "involves an unreasonable application of [Supreme Court] precedent if the state court either unreasonably extends a legal principle . . . to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).

"In order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520-21, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (citation omitted). "The state court's application must have been 'objectively unreasonable.'" *Id.* (citation omitted); *see also Clark v. Murphy*, 331 F.3d 1062, 1068 (9th Cir.), *cert. denied*, 540 U.S. 968 (2003).

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated

13

on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)." *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003).

In applying these standards, this Court looks to the last reasoned State court decision. *Davis v. Grigas*, 443 F.3d 1155, 1158 (9th Cir. 2006). To the extent no such reasoned opinion exists, as when a state court rejected a claim in an unreasoned order, this Court must conduct an independent review to determine whether the decisions were contrary to, or involved an unreasonable application of, "clearly established" Supreme Court precedent. *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). If the state court declined to decide a federal constitutional claim on the merits, this Court must consider that claim under a *de novo* standard of review rather than the more deferential "independent review" of unexplained decisions on the merits authorized by *Delgado*. *Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) (standard of *de novo* review applicable to claim state court did not reach on the merits).

## IV.

## DISCUSSION

### A.   GROUND ONE: *Miranda* Violation Based on July 25, 2001, Statement to Police

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

"Custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his

1  freedom of action in any significant way." *Id.* at 444; *Thompson v. Keohane*, 516

2  U.S. 99, 102, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995).

3      Here, there is no dispute that Petitioner invoked his right to remain silent.

4  (Ex. 1 at 14 to Answer). "[T]he admissibility of statements obtained after the

5  person in custody has decided to remain silent depends under *Miranda* on

6  whether his 'right to cut off questioning' was 'scrupulously honored.'" *Michigan v.*

7  *Mosley*, 423 U.S. 96, 104, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975); *Anderson v.*

8  *Terhune*, 516 F.3d 781, 784 (9th Cir.) (en banc), *cert. denied*, 129 S. Ct. 344

9  (2008).

10      After Petitioner invoked his right to remain silent, the detectives ceased the

11  interrogation and left the room.  Detective Conant returned to the interview room

12  to complete a probable cause form.  Petitioner asked him questions about what

13  the detective was filling out and what penalties Petitioner faced.  Conant

14  answered those questions and gave Petitioner a copy of the Penal Code.

15  Petitioner asked about his case, and Conant stated that Petitioner would have to

16  waive his rights in order for the detective to discuss it.  Petitioner then agreed to

17  waive his right to remain silent.

18      Petitioner argues that the detective's actions in returning to the interview

19  room to complete paperwork constituted "silent pressure" and "engineered

20  Petitioner into initiating conversation." (Reply at 5-6.)

21      The California Court of Appeal applied the correct legal framework. (Ex. 1

22  at 13-14 to Answer.)  The United States Supreme Court has ruled that:

23          *Miranda* safeguards come into play whenever a person in

24          custody is subjected to either express questioning or its

25          functional equivalent.  That is to say, the term "interrogation"

26          under *Miranda* refers not only to express questioning, but

27          also to any words or actions on the part of the police (other

28          than those normally attendant to arrest and custody) that the

15

1   police should know are reasonably likely to elicit an
2   incriminating response from the suspect. . . .  A practice that
3   the police should know is reasonably likely to evoke an
4   incriminating response from a suspect thus amounts to
5   interrogation. But, since the police surely cannot be held
6   accountable for the unforeseeable results of their words or
7   actions, the definition of interrogation can extend only to
8   words or actions on the part of police officers that they
9   *should have known* were reasonably likely to elicit an
10   incriminating response.

11   *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 100 S. Ct. 1682, 64 L. Ed. 2d 297

12   (1980) (footnotes omitted; emphasis in original).

13   The Supreme Court made clear that not all statements made by a person

14   after being taken into custody are deemed a product of interrogation. *Id.* at 299.

15   "'Volunteered statements of any kind are not barred by the Fifth Amendment and

16   their admissibility is not affected by our holding today." *Id.* at 300 (quoting

17   *Miranda*, 384 U.S. at 478). "'Interrogation,' as conceptualized in the *Miranda*

18   opinion, must reflect a measure of compulsion above and beyond that inherent in

19   custody itself." *Innis*, 446 U.S. at 300; *Cox v. Del Papa*, 542 F.3d 669, 675 (9th

20   Cir. 2008) ("*Miranda* applies only 'where a suspect in custody is *subjected to*

21   *interrogation*'") (emphasis in original, citation omitted).

22   The California Court of Appeal concluded that "[w]e do not see how an

23   officer's silence for a few minutes while filling out a necessary form can be

24   considered tantamount to interrogation." (Ex. 1 at 14 to Answer.) The Court of

25   Appeal considered filling out a probable cause form a "routine booking action"

26   that is not the functional equivalent of interrogation. (*Id.*) Moreover, the Court of

27   Appeal found that the detective's answers to Petitioner's questions were not the

28   functional equivalent of interrogation. (*Id.* at 15-16.)

16

1   The Court of Appeal's decision is not contrary to, or an unreasonable
2   application of, clearly established federal law.  In *Innis*, two officers had a
3   conversation in the petitioner's presence that there was a school for handicapped
4   children nearby and it would be unfortunate if children found a weapon and hurt
5   themselves.  *Innis*, 446 U.S. at 294-95.  The Supreme Court concluded that
6   petitioner was not interrogated within the meaning of *Miranda*.  *Id.* at 302.  "[I]t
7   cannot be fairly concluded that the respondent was subjected to the 'functional
8   equivalent' of questioning.  It cannot be said, in short, that Patrolmen Gleckman
9   and McKenna should have known that their conversation was reasonably likely to
10  elicit an incriminating response from the respondent." *Id.*; *United States v.*
11  *Moreno-Flores*, 33 F.3d 1164, 1168-69 (9th Cir. 1994) (police officer's statements
12  that agents seized about 600 pounds of cocaine and that petitioner was in
13  "serious trouble" were not the functional equivalent of interrogation).

14  Here, the detective silently filled out a probable cause form.  Petitioner
15  initiated conversation and asked questions.  The detective answered Petitioner's
16  questions about the content of the form and the penalties Petitioner faced.  The
17  detective's actions were of the type "normally attendant to arrest and custody"
18  and were not reasonably likely to elicit an incriminating response. *Innis*, 446 U.S.
19  at 300-01; *Moreno-Flores*, 33 F.3d at 1169 (informing defendant of
20  circumstances of his arrest is a statement normally attendant to arrest and
21  custody).

22  The Court of Appeal's analysis is not contrary to, or an unreasonable
23  application of, clearly established Federal law and is not an unreasonable
24  determination of the facts.  Petitioner's claim fails.

25  **B.    GROUND TWO: *Miranda* Violation Based on July 26, 2001**
26  **Statement to Police**

27  Petitioner argues that his statements on the next day, July 26, 2001, were
28  tainted by the statements obtained in violation of *Miranda* under Ground One.

17

1  (Reply at 8-9.)  On July 26, 2001, two new officers reminded Petitioner of his

2  *Miranda* rights and obtained a waiver from Petitioner.  The officers proceeded to

3  question Petitioner about a different set of crimes.  Petitioner argues that the two

4  detectives on July 26, 2001 "were the beneficiaries of the pressure applied by the

5  local in-custody interrogation on July 25, 2001" because from Petitioner's point of

6  view, "the warnings given by Conant governed also the interrogation on July 26,

7  2001."  (Reply at 9.)

8         Because Ground One is without merit, Ground Two is also without merit.[2]

9  Petitioner's claim fails.

10        **C.    GROUND THREE: Upper Term and Consecutive Sentences**

11        A judge cannot "impose a sentence above the statutory maximum based

12  on a fact, other than a prior conviction, not found by a jury or admitted by the

13  defendant."  *Cunningham v. California*, 549 U.S. 270, 274, 127 S. Ct. 856, 166 L.

14  Ed. 2d 856 (2007); *United States v. Booker*, 543 U.S. 220, 244, 125 S. Ct. 738,

15  160 L. Ed. 2d 621 (2005); *Blakely v. Washington*, 542 U.S. 296, 301, 124 S. Ct.

16  2531, 159 L. Ed. 2d 403 (2004).

17        Petitioner argues that the imposition of an upper term sentence in Count 3

18  and the consecutive sentences violate *Blakely*.  In its October 14, 2005 opinion,

19  the Court of Appeal addressed Petitioner's claim under *People v. Black*, 35 Cal.

20  4th 1238 (2005) (*Black I*), which was subsequently reversed and remanded in

21  January 2007 by the United States Supreme Court in *Cunningham*.

22        **(1)  Upper Term.**

23        "[T]he Federal Constitution's jury-trial guarantee proscribes a sentencing

24  scheme that allows a judge to impose a sentence above the statutory maximum

25  based on a fact, other than a prior conviction, not found by a jury or admitted by

26  _____

27        [2]   The California Court of Appeal correctly found that Petitioner's *Miranda*
rights were observed on July 26, 2001 separate and apart from the events of July
25, 2001, under precedent such as *Michigan v. Mosley*, 423 U.S. 96, 96 S. Ct.

28  321, 46 L. Ed. 2d 313 (1975).  (Ex. 1 at 16-21 to Answer.)

1   the defendant." *Cunningham*, 549 U.S. at 274. "[T]he 'statutory maximum for
2   *Apprendi* purposes is the maximum sentence a jury may impose *solely on the*
3   *basis of the facts reflected in the jury verdict or admitted by the defendant.*"
4   *Blakely*, 542 U.S. at 303 (emphasis in original). "[O]nly one aggravating factor is
5   necessary to set the upper term as the maximum sentence." *Butler v. Curry*, 528
6   F.3d 624, 643 (9th Cir. 2008).

7        The trial court imposed the upper term of nine years on Count 3 on the
8   ground that "the circumstances in aggravation greatly outweigh those in mitigation
9   for the violence and the number of victims and injuries shown here." (LD 9 at
10  2222.)

11       The trial court properly relied on the multiple-victim factor. Count 3 is one
12  of four counts based on events that occurred on July 21, 2001. (LD 10 at 317-
13  319.) Petitioner was convicted of the first degree murder of Jesus Muro Bicuno
14  (Count 1); and the attempted murders of Juan Carlos Cervantes Espinoza (Count
15  2), Francisco Javier Espinoza (Count 3), and Fidela Acevedo (Count 4). (LD 10
16  at 546-549, 317-319.) In convicting Petitioner on these four counts, the jury
17  necessarily found there were multiple victims. *See People v. Calhoun*, 40 Cal.
18  4th 398, 408, 53 Cal. Rptr. 3d 539 (2007) ("because the jury here found beyond a
19  reasonable doubt that Waller committed crimes against four separate victims, and
20  hence that the crimes involved multiple victims, Waller was not deprived of his
21  jury trial right"). The multiple-victim factor is sufficient to subject Petitioner to the
22  upper term sentence. *Butler*, 528 F.3d at 643.

23       Petitioner's claim fails.
24       **(2) Consecutive Sentences.**
25       Petitioner has not cited any United States Supreme Court decision holding
26  that consecutive sentences violate a defendant's Sixth Amendment rights. A
27  state court's decision cannot be contrary to clearly established Federal law if
28  there is a "lack of holdings from" the Supreme Court on a particular issue. *Carey,*

549 U.S. at 76; *see also Hassinger v. Adams*, 243 Fed. Appx. 286, 288 (9th Cir. 2007) ("Hassinger's claim that the trial court erred in imposing his sentences consecutively rather than concurrently does not implicate the constitutional rights involved in *Blakely*"), *cert. denied*, 128 S. Ct. 907 (2008).

Petitioner's claim fails.

## V.

## **RECOMMENDATION**

For the reasons discussed above, it is recommended that the District Court issue an Order (1) adopting this Final Report and Recommendation; and (2) directing that judgment be entered denying the Petition and dismissing this action with prejudice.

DATED: December 9, 2008

ALICIA G. ROSENBERG
United States Magistrate Judge

1

## NOTICE

2    Reports and Recommendations are not appealable to the Court of

3  Appeals, but are subject to the right of any party to file Objections as provided in

4  the Local Rules Governing Duties of Magistrate Judges, and review by the District

5  Judge whose initials appear in the docket number.  No Notice of Appeal pursuant

6  to the Federal Rules of Appellate Procedure should be filed until entry of the

7  Judgment of the District Court.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28